IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JAMES MARTIN,

       Plaintiff,

v.                                             CIV 13-0575 KBM/RHS

THE COUNTY OF SANTA FE,
OFFICER II., ROBERT JAMES GARCIA,
LT. JOSEPH E. MCLAUGHLIN, JR.,
SERGEANT, MIKE MARTINEZ, and
DEPUTY, GABE ORTIZ,
in their individual and official capacity as
Employees of the County of Santa Fe

       Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendants' Motion for Summary Judgment on All Claims Based in part on Qualified Immunity (*Doc. 32*), which was fully briefed on December 5, 2014 (*Doc. 51*), and on Defendants' Motion for Summary Judgment on Counts VI, VII and VIII of the First Amended Complaint for Tort Claims and Civil Rights Violations (*Doc. 63*), which was fully briefed on March 25, 2014 (*Doc. 70*).  Pursuant to 28 U.S.C. § 636 and Fed. R. Civ. P. 73, the parties have consented to me serving as the presiding judge and conducting all proceedings, including trial.  *Docs. 6, 9 and 10.*  Having reviewed the parties' submissions, including the video and audio evidence, and the relevant law, the Court finds that the motions are well taken and will be granted.

## I.  Procedural Posture

Plaintiff's Amended Complaint alleges eight separate causes of action against Defendants.  *Doc. 57.*  Specifically, Counts I and II  allege false arrest and imprisonment

and battery pursuant to the New Mexico Tort Claims Act, NMSA, § 41-4-1 et sec.,
("NMTCA");  Counts III, IV, V and VI bring federal claims  pursuant to 42 U.S.C § 1983
for alleged violations of Plaintiff's Fourth Amendment rights for failure to investigate,
unreasonable seizure, false imprisonment, and excessive and unnecessary force,
respectively;  Count VII alleges retaliation for the exercise of Plaintiff's First Amendment
rights; and Count VIII alleges a claim against the County of Santa Fe for failure to train
and supervise, and for negligent retention of the individual officers.

Prior to Plaintiff filing the Amended Complaint, Defendants filed their first motion
for summary judgment on the five claims brought in the original complaint (*Doc. 32*).
Defendants then filed a second motion for summary judgment on the newly added three
claims (*Doc. 63*).  Defendants argue that they are entitled to summary judgment under
the NMTCA because their actions were reasonable and privileged.  Defendants
additionally argue that they are entitled to qualified immunity with respect to claims
brought pursuant to § 1983.  As the two motions are based on the same set of facts, the
Court will address them together.

## II.  Legal Standard

"The court shall grant summary judgment if the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a
matter of law."  Fed. R. Civ. P. 56(a).  A "genuine" dispute exists where the evidence is
such that a reasonable jury could resolve the issue either way.  *See Adler v. Wal-Mart
Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 248, 106 S. Ct. 2505 (1986)).  "Where the record taken as a whole could
not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue

for trial.' " *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).  The "materiality" of a fact is determined by substantive law. *Anderson*, 477 U.S. at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  A mere scintilla of evidence in the non-movant's favor is not sufficient to defeat summary judgment.  *Id.*, 477 U.S. at 252.

Both the movant and the party opposing summary judgment are obligated to "cit[e] to particular parts of materials in the record" to support their factual positions. Fed. R. Civ. P. 56(c)(1)(A) (emphasis added); *see also* D.N.M.LR-Civ. 56.1(b). Alternatively, parties may "show[] that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B); *see also Medlock v. United Parcel Service, Inc.*, 608 F.3d 1185, 1189 (10th Cir. 2010) ("[I]f the matter in issue concerns an essential element of the nonmovant's claim, the moving party may satisfy the summary judgment standard by identifying a lack of evidence for the nonmovant on [that] element.") (internal quotation and citation omitted) (alteration in original).

The court may consider only admissible evidence when ruling on a motion for summary judgment. *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1209 (10th Cir. 2010) (affirming that "it is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment").  However, only the content of the evidence must be admissible.  *Adams v. Am. Guarantee & Liab.*

*Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citations omitted).  "The nonmoving party does not have to produce evidence in a form that would be admissible at trial, but the content or substance of the evidence must be admissible." *Id.* (internal quotations and citations omitted).

The court must consider the record, and all reasonable inferences therefrom, in the light most favorable to the party opposing the motion, *Adler* at 670 (citing *Anderson*, 477 U.S. at 248), but the court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(C)(3).  In the event that a party fails to cite materials or otherwise properly address another party's assertion of fact, the court may consider the fact undisputed and where the movant is entitled to it, grant summary judgment.  Fed. R. Civ. P. 56(e); D.N.M.LR-Civ. 56.1 ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

### III. Undisputed Material Facts

Plaintiff contends that there is a dispute of material fact.  Although Plaintiff asserts that certain facts are "Disputed," he fails to cite to particular parts of the record to support his factual positions, show that materials cited by Defendants do not establish the absence of a genuine dispute, or establish that Defendants cannot produce admissible evidence to support their facts.  Plaintiff's purported disputes are often simply the argument of counsel, which cannot be used to defeat summary judgment.  *Fritzsche v. Albuquerque Mun. Sch. Dist.*, 194 F. Supp. 2d 1194, 1206 (D.N.M. 2002) ("The argument of counsel is not evidence, and therefore does not provide a proper basis for denying summary judgment.").  Further, many of Plaintiff's

4

additional facts are not only unsupported by citation to the record,[1] they are simply immaterial.

On June 13, 2012, at around 9:15 p.m., Santa Fe County Dispatch received a 911 call from Joseph Montoya stating that a person at 1890 Gils Way, Apartment #2, had been shot in the leg. Defendants' Undisputed Material Fact ("UMF") 1.[2]  A frantic Mr. Montoya informed the dispatcher that law enforcement needed to "hurry" to the scene, that the victim of the gunshot was "bleeding like crazy" from a "big hole" and that the victim was "intoxicated big time" and "paranoid."  Plaintiff's Exh. A, 911 Audio file (OEAUKC9101267801.wav).  The Court's review of the recorded call reveals that Mr. Montoya responded "he's right in front of my house" in response to the dispatcher's question, "Where is the guy who shot him?"  *Id.*

Santa Fe Sherriff's Deputies, Defendants McLaughlin, Martinez, Garcia, and Ortiz responded to the call.  UMF 2.  McLaughlin arrived on scene first and saw two males, later identified as Mr. Montoya and Plaintiff, walking towards the sheriff's vehicle. UMF 3 and 4; Ex. 10 at 21:25:24.  The other deputies arrived in quick succession behind McLaughlin.  Ex. 10 at 21:25:30.  There were no street lights in the area and the only illumination came from the officers' vehicles.  UMF 5; Ex. 10.  When the deputies arrived on the scene, they all believed that there had been a shooting at that location. UMF 26.

---

[1] While the Court need not consider facts that are not supported by citations to the record, where Plaintiff's exhibits obviously support additional material facts, as in the case of the affidavit of Mr. Martin, the Court will consider those facts.

[2] Contrary to the Local Rules, Plaintiff numbers his additional facts rather than using letters.  *See* D.N.M.LR-Civ. 56.1(b) ("The Response may set forth additional facts . . . .  Each additional fact must be lettered . . . .).  The citations used herein are to Defendants' numbered facts (*Doc. 63*) unless otherwise indicated.

McLaughlin got out of his vehicle and drew his side arm.  UMF 6.  McLaughlin saw that one man was pointing at the other man, but he did not understand the meaning of the gesture.  UMF 7.  Plaintiff admittedly had been drinking – having consumed three and a quarter 16-ounce cans of Heineken beer – and was holding a can of beer as he approached McLaughlin with his arms spread open.  UMF 9; Ex. 10 at 21:25:34-44.  As Plaintiff neared the police vehicle, he said something to the effect of "You going to shoot me again?" several times.  *Id.*  McLaughlin did not see any sign of injury on Plaintiff.  UMF 11.[3]  Plaintiff told the officers that he had been shot but did not give the officers any information as to the identity or whereabouts of the shooter.  UMF 27.  Plaintiff was acting belligerent and appeared to be intoxicated.  UMF 14.[4]

McLaughlin ordered the two men to get on the ground and Plaintiff initially complied.  Ex. 10 at 21:25:45-51.  McLaughlin then ordered Plaintiff to "get on your belly" and Plaintiff responded by opening his beer and remained in a seated position.  *Id.* at 21:25:52-57.  As Officer Martinez approached Plaintiff from the left, Plaintiff placed his beer in his right hand.  Martinez grasped Plaintiff's left arm with his left hand and placed his right hand to the side of Plaintiff's neck and began pushing him on to his stomach.  UMF 17; Ex. 10 at 21:25:58-21:26:03.  Plaintiff placed his hands on the ground, preventing his body from rolling on to his stomach; as a result, Ortiz and

---

[3] Plaintiff claims to dispute Fact No. 11 because, he argues, "Plaintiff had a plainly visible bandage upon his leg."  However, the bandage is not clear in the evidence submitted to the Court.  Plaintiff also cites to the Affidavit of Robert James Garcia who admits that he saw a bandage on Plaintiff's leg.  However, Garcia arrived after McLaughlin had already detained Plaintiff.  *Doc. 65-3* at 2, ¶ 7.  Therefore, Plaintiff does not produce any evidence to dispute Fact No. 11.

[4] Plaintiff admits that he had been drinking alcohol but disputes that he was "inebriated to the point I could not make rational decisions . . . ."  *Doc. 36-3* at 3.  Whether Plaintiff was actually intoxicated and to what degree is immaterial as all of the evidence indicates that Plaintiff appeared to be intoxicated to the officers at the time.  *Doc. 32-1* at 2, ¶¶ 14, 19, 20, 24; *Doc. 32-2* at 2, ¶ 11; *Doc. 32-4* at 2, ¶ 7.  Plaintiff's reliance on his ability to take two steps backwards without falling at one point is insufficient to raise a material issue as to this fact.

McLaughlin assisted in placing Plaintiff on to his stomach which resulted in knocking Plaintiff's beer over.  Ex. 10 at 21:26:03-32 (Plaintiff repeatedly yelling "don't waste the beer").

McLaughlin then placed a knee on Plaintiff's back while officers placed handcuffs on him.  *Id.*; UMF 25. McLaughlin remained with his knee on Plaintiff's back while other officers secured the area, a period of about nine minutes.  Ex. 10 at 21:26:33-21:34:32; UMF 25, UMF 30.  This was the safest position for the officer to maintain physical control over Plaintiff so he could not evade or harm the officers.  UMF 25.  While he was on the ground, Plaintiff began kicking his legs up and McLaughlin restrained Plaintiff's right leg by holding the ankle and bending the lower leg up to restrict Plaintiff's leg movement.  UMF 25a.  A female officer held Plaintiff's left ankle to stop the kicking but did not apply force to the injured leg.  *Id.*

Plaintiff indeed had a gunshot wound in his left thigh.  UMF 28.  Prior to the officer's arrival, Plaintiff had dressed the wound with Mr. Montoya's assistance.  *See* Plaintiff's Fact No. 8, Ex. C.  Prior to being forced on to his stomach, Plaintiff did not tell the officers he had a leg wound.  UMF 22; Ex. 10 at 21:26:33-37.  Plaintiff told the officers he did not want medical treatment, and the officer told Plaintiff that he was going to the hospital whether he liked it or not.  *Plaintiff's Fact Nos.* 35, 36.  When the medics attempted to put Plaintiff on the gurney, he protested.  UMF 31. McLaughlin assisted the EMTs in placing Plaintiff on the gurney and held his head while the medics put soft restraints on his ankles and wrists. UMF 32[5], 33; *Doc. 69-2* at 2, ¶ 10.  The EMTs also

---

[5] Plaintiff asserts Fact No. 32 is disputed and directs the Court to the EMT report which, he contends "shows Mr. Martin's wrists remained cuffed behind his back."  *Doc. 36* at 6.  The report states, "PT placed supine on gurney with hands cuffed behind back."  *Docs. 35-5 at 3; 65-4* at 3.  The report does not state that Plaintiff remained that way.  The affidavit of the EMT explains that after Plaintiff was placed on the

believed the Plaintiff to be intoxicated and because he was resisting their efforts by kicking and spitting, Plaintiff's hands remained restrained behind his back until after medical treatment had begun.  *Doc. 36-3* at 3, ¶¶ 29-30.

It was only after the ambulance arrived that the Santa Fe County Sheriff's Deputies learned from Plaintiff's girlfriend that the shooting had not occurred at the Gils Way Apartments but earlier that day at a local grocery store.  UMF 34-36.  Plaintiff was not arrested or charged with any crime.  UMF 45.

## IV. Plaintiff's Rule 56(d) Affidavit

In response to Defendants' first motion for summary judgment, Plaintiff's counsel submitted a Rule 56(d)[6] affidavit asserting that he requires further discovery in order to respond.  Plaintiff appears to abandon this position in response to the second motion, as much of the evidence he seeks pursuant to the Rule 56(d) affidavit was subsequently produced.  However, Plaintiff has not specifically withdrawn the affidavit and the Court will address it here.

Rule 56(d) permits a court to defer considering a motion for summary judgment to allow time for additional discovery "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(d).  "The protection afforded by Rule 56(d) is designed to safeguard against a premature or improvident grant of summary judgment."  *Pasternak v. Lear*

---

gurney, McLaughlin removed the handcuffs and the EMTs placed "soft restraints" on his legs and arms, and straps around his torso and pelvis.  Ex. 11, *Doc. 69-1* at 2, ¶¶ 10-11; Ex. 12, *Doc. 69-2* at 2, ¶ 12.  After the restraints were in place, the Santa Fe Deputies exited the ambulance and left Plaintiff in the care of the EMTs.  Ex. 11, *Doc. 69-1* at 2, ¶ 15; Ex. 12, *Doc. 69-2* at 2, ¶ 16.

[6] Plaintiff identifies the affidavit by its former number, Rule 56(f).  *See Advisory Committee Notes*, 2010 Amend. ("Subdivision (d) carries forward without substantial change [to] the provisions of former subdivision (f).")

*Petroleum Exploration, Inc.*, 790 F.2d 828, 832–833 (10th Cir. 1986).  "Rule 56[(d)] may not be invoked by the mere assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable; the opposing party must demonstrate how additional time will enable him to rebut movant's allegations of no genuine issue of fact."  *Id.* at 833 (internal quotation and citation omitted).

In the Tenth Circuit, Rule 56(d) "does not operate automatically"; rather, "its protections . . . can be applied only if a party satisfies certain requirements."  *Valley Forge Ins. Co. v. Health Care Mgmt. Ptnrs., LTD*, 616 F.3d 1086, 1096 (10th Cir. 2010) (quoting *Price ex rel. Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000)) (ellipsis in original).  Specifically, the party's affidavit must identify:  "(1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how additional time will enable the party to obtain those facts and rebut the motion for summary judgment."  *Id.* (internal quotations omitted).

Plaintiff proclaims that Defendants' depositions are needed to explore inconsistencies between the officers' affidavits and incident reports, as well as provide information on what the officers did during the investigation, why they believed that Plaintiff was a potential suspect, whether they knew him prior to the encounter at issue, and about when the officers removed their handcuffs from his wrist.  *Doc. 36-11* at 1-2. Plaintiff also contends he needs the depositions of a Rule 30(b)(6) representative "to determine what if any standard operating procedures were in place" regarding recording devices, report writing, training in dealing with injured and intoxicated people, and whether an internal investigation took place.  *Doc. 36-11* at 2.  Insofar as Plaintiff seeks

the deposition of the custodian of records for belt tapes, 911 calls, and dash cam videos, *Doc. 36-11* at 3, it appears that the issue was resolved after the filing of the Rule 56(d) affidavit and is now moot.  As previously noted, the parties have now submitted CDs of the 911 dispatch tapes and the dash cam video in conjunction with the motions for summary judgment.

In sum, Plaintiff's Rule 56(d) affidavit falls short of the rule's requirements, and much of the information he seeks is already contained in the record.  Plaintiff's general averments do not explain what probable facts are not available or how the information sought might rebut the facts set forth in the motions to create a genuine issue of material fact.  Therefore, the Court will deny his request for additional time to conduct discovery.

**V.  <u>Discussion</u>**

    A.  <u>Federal Constitutional Claims</u>

        1.  <u>Law Governing § 1983</u>

Plaintiff brings his Federal claims pursuant to 42 U.S.C § 1983, which provides civil redress for deprivation of constitutional rights by a state actor.  *Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995), *abrogated on other grounds by Saucier v. Katz,* 533 U.S. 194, 205, 121 S. Ct. 2151, 2158 (2001).  Section 1983 was enacted "to provide protection to those persons wronged by the misuse of power."  *Id.*  (quoting *Owen v. City of Independence, Mo.*, 445 U.S. 622, 650, 100 S. Ct. 1398, 1415(1980)).  "Section 1983 creates no substantive civil rights, only a procedural mechanism for enforcing them."  *Id.* (citation omitted).

Qualified immunity is an affirmative defense to a section 1983 action, and the

individual defendants have moved for summary judgment on the federal claims on that ground.  *Id; see also, DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001).  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982)).

When a defendant raises qualified immunity at summary judgment, the burden shifts to the plaintiff to show: "(1) the defendant violated a constitutional right and (2) the constitutional right was clearly established."  *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013).  The court has discretion to address either prong first.  *Pearson*, 555 U.S. at 236.  Because qualified immunity is not just a defense to liability but immunity from suit, whether qualified immunity applies should be determined at the "earliest possible stage in litigation."  *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534 (1991)).

### 2.  The Fourth Amendment Claims

The Fourth Amendment to the Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  Under the Fourth Amendment, there are "three types of police/citizen encounters: consensual encounters, investigative stops, and arrests."  *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000).  "These categories are not static and may escalate from one to another."  *Cortez v. McCauley*,

478 F.3d 1108, 1115 n.5 (10th Cir. 2007).

An investigative stop requires only reasonable suspicion.[7]  "The police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."  *Id.*  (citations and quotations omitted).  With reasonable suspicion of criminal activity, an officer may briefly detain the individual "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."  *Id.*

When a police encounter exceeds the limits of an investigative detention, the detention becomes an arrest that requires probable cause.  *See United States v. White*, 584 F.3d 935, 952 (10th Cir. 2009).  "Probable cause exists if facts and circumstances within the officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing a crime."  *Oliver*, 209 F.3d at 1186 (internal quotation and citation omitted).

There is no "litmus-paper test" for determining when the escalation from an investigatory stop to an arrest occurs.  Generally, "[a]n arrest is distinguished from an investigative *Terry* stop by the involuntary, highly intrusive nature of the encounter."  *Id.* (quoting *Cortez*, 478 F3d at 1115).  "[T]he use of firearms, handcuffs, and other forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest."  *Id.*  It must be emphasized, however, that

> the safety of law enforcement officers during the performance of their
> duties is a "legitimate and weighty" concern. *Pennsylvania v. Mimms*, 434

---

[7] This is often referred to as a "*Terry* stop."  *See Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968).

> U.S. 106, 110, 98 S. Ct. 330, 54 L.Ed.2d 331 (1977).   Consequently, officers may use force during a *Terry*-type detention to the extent that "such steps [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [the] stop." *United States v. Hensley*, 469 U.S. 221, 235, 105 S. Ct. 675, 83 L.Ed.2d 604 (1985).

*Novitsky v. City Of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007).   Accordingly, in certain circumstances, officers may draw their weapons, place a suspect in handcuffs, or force a suspect to the ground without escalating a detention into an arrest.   *Id.* (citing *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993)).

"In evaluating whether the precautionary steps taken by an officer were reasonable, 'the standard is objective – would the facts available to the officer at the moment of the seizure  . . .  warrant a man of reasonable caution in the belief that the action taken was appropriate.'"   *Id.* (quoting *Gallegos v. Colorado Springs*, 114 F.3d 1024, 1030-31 (10th Cir. 1997)).   "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."   *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871-72 (1989).   The test of reasonableness must take into account the facts and circumstance of each particular case and includes consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."   *Id. a*t 1872.

Moreover, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."   *Id.*   "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in

light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.*

In essence, Plaintiff claims that he was subjected to an unlawful arrest and that officers "continued to keep Plaintiff restrained all the way to the hospital . . . exceeding the scope and duration of a properly executed investigation would have permitted." *Doc. 36* at 21.  Defendants maintain that restraining Plaintiff was not an arrest, but rather a temporary investigative detention which blossomed into emergency assistance. Having examined the undisputed facts, the Court finds that no reasonable juror could find that Plaintiff was arrested or that his detention at the scene or transport to the hospital for emergency medical care constituted an unreasonable search or seizure.

In the instant case, officers believed they were approaching a scene with an active, unidentified shooter present.  Officers arrived in an unlit area after dark believing there was an active shooter in the area.  Immediately upon their arrival, Plaintiff was uncooperative and belligerent and the deputies did not know if Plaintiff was armed or dangerous.  Plaintiff also appeared to be intoxicated.  The Tenth Circuit has recognized that "individuals who are intoxicated are often unpredictable" and, therefore, add "an additional layer of uncertainty" to the situation.  *Novitsky,* 491 F.3d at 1255.

Plaintiff ignored the officers' directions to him, and it took three officers to secure him so that officers could safely continue their investigation into whether an active shooter was on the premises.  Even then, Plaintiff continued to struggle with McLaughlin, and at one point kicked him so hard that McLaughlin had to further restrain Plaintiff's right leg.  It was only because Plaintiff did not submit to the show of authority by Defendants and follow the officers' commands that he had to be physically restrained

14

to assure officer safety.  The manner of restraint could only be deemed reasonable in light of Plaintiff's uncooperative and resistant behavior and the serious offense being investigated.

Moreover, McLaughlin had Plaintiff on the ground in that manner only for the time it took the other officers to insure that there was not an active shooter in the vicinity. Plaintiff's contends that he should have been released when he self-identified as a shooting "victim" to the deputies.  *Doc. 36* at 10.  But law enforcement was not required to take this representation on its face as true; nor would the fact that he, in fact, had been shot exclude him from also having been the shooter being sought.  Given these circumstances, it was reasonable for McLaughlin to detain Plaintiff for the nine minutes needed to maintain the status quo while officers cleared the area.

Finally, Plaintiff contends that because he was forced into the ambulance with his hands secured behind his back[8] until he arrived at the hospital, he was unlawfully seized because any investigative detention had been concluded.  This argument ignores that, under certain circumstances applicable here, law enforcement officers can seize a citizen for a non-investigatory purpose.

> Indeed, police officers are not only permitted, but expected, to exercise what the Supreme Court has termed "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S. Ct. 2523, 2527, 37 L.Ed.2d 706 (1973).  In the course of exercising this noninvestigatory function, a police officer may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity.  *See, e.g., United States v. Rideau,* 949 F.2d 718, 720 (5th Cir.1991) (officers stopped defendant for his own safety and the safety of others after

---

[8]   No evidence has been presented to dispute that during his transport to the hospital the restraints were "soft restraints" used by the EMTs and not the officer's handcuffs.

> observing him standing in the middle of the road at night, dressed in
> dark clothes, and apparently intoxicated), vacated on other grounds,
> 969 F.2d 1572 (5th Cir.1992) (en banc) (agreeing with panel on this
> point); *United States v. Wallace*, 889 F.2d 580, 582 (5th Cir.1989)
> (officers detained defendant for his own safety after being informed
> that he possessed gun and had threatened suicide), *cert. denied*,
> 497 U.S. 1006, 110 S. Ct. 3243, 111 L.Ed.2d 753 (1990).

*United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993); *see also United States v. Garner*, 416 F.3d 1208, 1215 (10th Cir. 2005) (government's community caretaking interest outweighed Plaintiff's interest in being free from "arbitrary interference as the anonymous source had reported that [he] had remained in the field for several hours and appeared unconscious [and] might well have needed medical assistance, and the government had a substantial interest in protecting him.").

The uncontroverted evidence shows that officers were concerned with Plaintiff obtaining medical care for his gunshot wound and not with conducting a criminal investigation; indeed, Plaintiff was not questioned, arrested, or charged with a crime. Plaintiff's apparent intoxication, including his plea to "don't waste the beer," Mr. Montoya's statement to the dispatcher that the shooting victim was "dizzy as hell," and blood loss from the gunshot wound obviously raised concerns that Plaintiff was unable to comprehend the serious nature of both his injury and the situation. All of the evidence indicates that sheriff's deputies were performing their community caretaking function by ensuring that Plaintiff received necessary medical attention once the scene had been secured. Thus, Defendants are entitled to summary judgment on the Fourth Amendment, § 1983 claims.

  3. The First Amendment Claim

Plaintiff contends that he was engaged in protected speech by protesting the

16

officers' actions.  Any form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom."  *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (quoting *Lackey v. County of Bernalillo*, No. 97-2265, 1999 WL 2461, at *3 (10th Cir. 1999)).  When a plaintiff alleges retaliatory conduct by a defendant who is not the plaintiff's employer or in a contractual relationship with plaintiff, plaintiff must prove:

> 1) that the plaintiff "was engaged in a constitutionally protected activity"; (2) that the defendant's actions caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) that the "defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct."

*Id.*

Plaintiff argues that his protected speech included:  1) informing the officers he was the victim and asking if they were going to shoot him again; 2) asking the officers why they were doing this to a guy who has been shot; and 3) saying something inaudible to McLaughlin.  Even if Plaintiff's statements could somehow be construed as protected speech, he fails to offer evidence from which a reasonable juror could conclude that the officers were substantially motivated to detain him as a response to his exercise of constitutionally-protected conduct rather than securing the scene and assuring that he received appropriate medical attention.

### 4.  Entitlement to Qualified Immunity

As indicated above, the Court concludes that the undisputed material facts demonstrate that the individual defendants did not violate Plaintiff's constitutional rights. But even if the Court is incorrect, the second prong of the qualified immunity analysis

provides relief to the officers as their actions did not constitute a clearly established violation of Plaintiff's constitutional rights at the time of the incident.

In order to establish that a right was "clearly established," the alleged violation "must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012) (quotations and citations omitted). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) (quoting *Cruz v. City of Laramie*, 239 F.3d 1183, 1187 (10th Cir. 2001)).

Since the undisputed material facts establish that the officers' actions under the circumstances were reasonable under the circumstances and without retaliatory motive, the individual Defendants are entitled to qualified immunity on the federal claims as there was no case law at the time that would have supported a contrary conclusion.

5.  Plaintiff's Claim for Failure to Train/Supervise and Negligent Retention

It is well established that a government entity may not be held liable in a § 1983 cause of action where there is no underlying constitutional violation by any of its officers. *Trigalet v. City of Tulsa*, 239 F.3d 1150, 1155-56 (10th Cir. 2001); *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."). Since the undisputed material facts establish that the

Defendants did not violate Plaintiff's constitutional rights, he cannot maintain a claim for failure to train/supervise or negligent retention against the County.

    B.  <u>New Mexico State Tort Claims</u>

        1.  <u>False Arrest and Imprisonment</u>

Plaintiff argues that he was subjected to an unlawful arrest and falsely imprisoned until he was treated at the hospital.  Under New Mexico law, "the tort of false imprisonment occurs when a person intentionally confines or restrains another person without consent and with knowledge that he has no authority do to so."  *Santillo v. N.M. Dep't of Pub. Safety,* 2007-NMCA-159, 143 N.M. 84, 88, 173 P.3d 6, 10.  "A false arrest is merely one way of committing false imprisonment."  *Id.*

Consistent with dictates of the federal constitution, New Mexico law provides that "in appropriate circumstances, a police officer may detain a person in order to investigate possible criminal activity, even if there is not probable cause to make an arrest."  *State v. Lovato*, 1991-NMCA-083, ¶ 10, 112 N.M. 517, 519 (quoting *State v. Cobbs*, 103 N.M. 623, 626, 711 P.2d 900, 903 (Ct. App.1985)).  The officer conducting such an investigatory detention "must have a reasonable suspicion, based upon specific articulable facts and any rational inference that can reasonably be drawn from such facts, that the law has been or is being violated."  *Id.*

As with federal law, whether the police have conducted an arrest[9] as opposed to an investigative detention depends on the particular facts of each case.  *Id.* at 521 (citing *Cobbs*).  The ultimate question is whether the officer's actions were reasonable

---

[9]  An arrest must be also supported by probable cause under New Mexico law.  *Santillo v. N.M. Dep't of Pub. Safety*, 2007-NMCA-159, 143 N.M. 84, 88, 173 P.3d 6, 10.  Defendants have not argued that they had probable cause to seize Plaintiff and thereby "arrest" him.  Rather, Defendants dispute that their detention of Plaintiff rose to the level of an arrest.

under the circumstances.  *Id.* at 522; *see also State v. Wilson*, 142 N.M. 737, 743

(2007) ("Whether a stop is an investigatory detention or a de facto arrest is a question

analyzed under the Fourth Amendment reasonableness inquiry.").

Having already conducted the Fourth Amendment reasonableness inquiry, and

noting that the circumstances here do not implicate any more expansive rights under

the New Mexico state constitution,[10] Defendants are similarly entitled to summary

judgment on the false arrest and false imprisonment claims.[11]

2. Battery

"It is black-letter law that causing an offensive touching, even indirectly to

another's clothing and not resulting in injury, is the tort of battery."  *Selmeczki v. N.M.*

*Dep't of Corr.*, 2006-NMCA-024, 139 N.M. 122, 131, 129 P.3d 158, 167 (citing *State v.*

*Ortega*, 113 N.M. 437, 440–41, 827 P.2d 152, 155–56 (Ct. App. 1992)).  It has long

---

[10]  For instance, unlike federal law, the New Mexico constitution prohibits:  a warrantless search of an automobile even if the search is supported by probable cause, absent exigent circumstances,  (*State v. Gallegos*, 2003-NMCA-079, 133 N.M. 838, 841, 70 P.3d 1277, 1280); a search  warrant based solely on sworn oral testimony in the absence of a written affidavit (*State v. Boyse*, 2013-NMSC-024, 303 P.3d 830, 834); and, in the absence of reasonable suspicion of criminal activity, a Border Patrol agent at a permanent checkpoint detaining and questioning a motorist after having asked about  citizenship and immigration (*State v. Cardenas-Alvarez*, 2001-NMSC-017, 130 N.M. 386, 393-94, 25 P.3d 225, 232-33).

[11]  The analysis to be used for the state law claims mimics that for the federal claims.  Detention is authorized where an officer reasonably could believe that detaining a person was "necessary to preserve the peace and to further his investigation."  *Romero v. Sanchez*, 1995-NMSC-028, 119 N.M. 690, 693, 895 P.2d 212, 215 (citing *Perea v. Stout*, 1980-NMCA-077, 94 N.M. 595, 600-01, 613 P.2d 1034, 1039-40) (officer's reasonable belief that detention of plaintiff was necessary as a defense to claim of false imprisonment).  "A court should consider both the length of the detention and the manner in which it is carried out when determining whether a lawfully-initiated investigatory detention has become unlawfully extended."  *State v. Sewell*, 2009-NMSC-033, 146 N.M. 428, 432, 211 P.3d 885, 889.  With respect to the temporal duration, the courts have not set a specific time limit in which an investigatory detention becomes an arrest, but the scope of an investigatory stop must be related to the initial reason for the stop.  *Id.*  With regard to the manner of the detention, there is a "legitimate and weighty interest" in officer safety during investigatory detentions.  *See State v. Leyva*, 2011-NMSC-009, 149 N.M. 435, 454, 250 P.3d 861, 880 (citing *Arizona v. Johnson*, 555 U.S. 323, 330, 129 S. Ct. 781, 786, 172 L. Ed. 2d 694 (2009)).  Therefore, an officer may use reasonable force to detain a person in order to maintain the status quo and for officer safety reasons.  *See State v. Madsen*, 2000-NMCA-050, 129 N.M. 251, 256, 5 P.3d 573, 578 (quoting *State v. Lovato*, 1991-NMCA-083, 112 N.M. 517, 522, 817 P.2d 251, 256) ("Where there is reason for the officers to fear for their safety, they may unholster their guns and use reasonable force in effectuating the stop without such action automatically constituting an arrest.").

been the law of New Mexico, however, that

> [o]fficers, within reasonable limits, are the judges of the force necessary to enable them to make arrests or to preserve the peace. When acting in good faith, the courts will afford them the utmost protection, and they will recognize the fact that emergencies arise when the officer cannot be expected to exercise that cool and deliberate judgment which courts and juries exercise afterwards upon investigations in court.

*Mead v. O'Connor*, 1959-NMSC-077, 66 N.M. 170, 173, 344 P.2d 478, 479-80.  As discussed above, the officers' actions in detaining Plaintiff during their investigation on the scene constituted a reasonable use of force.

Moreover, New Mexico also recognizes that "police have dual roles as criminal investigators and community caretakers."  *See State v. Ryon*, 2005-NMSC-005, 137 N.M. 174, 180-81, 108 P.3d 1032.  "The community caretaker exception recognizes that warrants, probable cause, and reasonable suspicion are not required when police are engaged in activities that are unrelated to crime-solving."  *Id.*, 137 N.M. at 184.  The test adopted by the New Mexico Supreme Court is the "primary motivation" standard, which requires that the motivation for the search or seizure must be the "protection of human life or property . . . rather than the desire to apprehend a suspect or gather evidence for use in a criminal proceeding."  *Id.* at 188 (quotations and citation omitted).  "The ultimate issue is whether officers had a reasonable concern that an individual's health would be endangered by a delay, and in fact were motivated by a need to address that concern."  *Id.*  Once again, Plaintiff's battery claims associated with his transport to the hospital for a medical evaluation and necessary care cannot survive summary judgment.

## VI. <u>Conclusion</u>

In this case there is no genuine dispute of any material fact.  The material facts establish that Defendants acted reasonably under New Mexico law and are entitled to

qualified immunity for the actions taken during the encounter with Plaintiff on June 13, 2013.  Plaintiff cannot establish a violation of his constitutional rights by the individual defendants and, therefore, cannot establish a claim against the County of Santa Fe.

IT IS THEREFORE ORDERED that Plaintiff's request pursuant to Rule 56(d) is **denied,** and Defendants' Motions for Summary Judgment (*Docs. 32 and 63*) are **granted**.  A final judgment pursuant to Rule 58 will be entered.

_____
UNITED STATES CHIEF MAGISTRATE JUDGE
Presiding by Consent